
# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2017

## STATE OF TENNESSEE v. DONDRE JOHNSON

**Appeal from the Criminal Court for Shelby County**
No. 14-01032     Chris Craft, Judge

_____

### No. W2015-02401-CCA-R3-CD
_____

The Defendant, Dondre Johnson, was convicted by a Shelby County Jury of first degree murder committed during the perpetration of an attempted robbery and received a sentence of life imprisonment. In his sole issue on appeal, the Defendant challenges the sufficiency of the evidence supporting his conviction. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Phyllis Aluko, Assistant Public Defender (on appeal); and Constance J. Barnes, Assistant Public Defender, Memphis, Tennessee (at trial), for the Defendant-Appellant, Dondre Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Ray Lepone and Reginald Henderson, Assistant District Attorney Generals, for the Appellee, State of Tennessee.

## OPINION

This case arises from the murder of David Santucci in August 2013. The Defendant and his co-defendant, Mario Patterson, were subsequently arrested and charged with first degree felony murder. The State filed a motion to sever the Defendant's case from his co-defendant's case, and the trial court granted the motion. Following a jury trial, the Defendant was convicted as charged. As relevant to the issues raised by the Defendant in this appeal, the facts presented at the September 2015 trial were as follows:

Steven Ferguson testified that on August 12, 2013, he was working as a security guard at the Rumba Room nightclub on South Main Street in Memphis. Around 1:30 a.m., Ferguson was outside smoking a cigarette with a group of people and two other security guards. Ferguson testified that he noticed a car drive past the nightclub and quickly make a U-turn in the street, which got his attention. After the car drove away, Ferguson heard a gunshot, and he looked down the street and saw "a guy running towards the car." Ferguson recalled that "[the guy] got in the back seat, right behind the driver's side," before the car sped off. Ferguson also testified that there were no streetlights where he had seen the car so he could not identify the person who got in the car. Ferguson and another security guard walked towards the area where the car had been, saw the victim lying in the street, and called the police. Ferguson testified that a group of people gathered around the victim and that he turned the victim on his back while bystanders applied pressure to the wound and talked to the victim in an attempt to keep him conscious. Ferguson recalled that there was blood on the ground and a cell phone was lying next to the victim, who he identified as a white male in his late twenties. Ferguson testified that the nightclub he worked at was about ten or fifteen feet away from where the shooting occurred.

Taneshia Lawrence testified that she was at the same nightclub around 1:30 or 2:00 a.m. on August 12, 2013. Lawrence testified that she was sitting outside at a bench on the corner of South Main Street and Pontotoc Street when she heard a gunshot. Lawrence recalled seeing a light green or gray Pontiac speed past and turn down Pontotoc Street from Main Street. Lawrence also recalled seeing a man run to the car and two men jump in the back of the car. Lawrence testified that, before the gunshot, she saw "a white male and a black male, facing each other," and that, after the gunshot, she saw the white male fall. After the security guards ran to the victim, Lawrence also walked to the victim and, along with another bystander, comforted the victim and put pressure on his wound. Lawrence testified that the victim was unable to speak and was "basically just g[]asping for breath and squeezing my hand." Lawrence also saw a gunshot wound on the victim's upper chest.

Sharae Robertson testified that she was walking outside the Rumba Room around 1:30 a.m. on August 12, 2013. Robertson heard a gunshot and then saw a "green Grand Am speeding down Pontotoc Street." Robertson testified that she walked to where she heard the gunshot and saw "a white male lying in between a burgundy car and a black truck." Robertson recalled that the victim "was l[]ying on his back and he was gasping for air, trying to breathe and talk, but he couldn't." Along with Lawrence, Robertson assisted the victim and "tried to help him by applying pressure to his wound and let him know that somebody was there for him." Robertson also testified that she saw three individuals in the car, two males and one female.

Officer Aaron Kant of the Memphis Police Department ("MPD") responded to a call at the area of 275 South Main Street on the night of the murder. He arrived in less than a minute and immediately saw the victim lying unconscious on the ground. Officer Kant also observed two women on each side of the victim rendering aid when he arrived on the scene. Officer Kant was the first officer on the scene. After confirming it was not an active shooter situation, Officer Kant gathered witness information and immediately put out a city-wide broadcast with a description of the car witnesses observed leaving the scene. After the victim was taken by ambulance, Officer Kant noticed blood and a shell casing on the ground. Other MPD officers took photographs and collected evidence at the scene, including a single nine millimeter Luger shell casing and a spent bullet.

MPD Officer Ashton Britton testified that he was on patrol on August 12, 2013, when he heard a call on police radio about a shooting and a description of the shooter's car. Officer Britton proceeded to the nearby Foote Homes area to drive around and look for the car. In the parking lot of the Foote Homes apartment complex, Officer Britton saw a car with its parking lights on. Officer Britton testified that, in his experience, this was unusual, and there had been a lot of recent car break-ins in the area, so he proceeded to investigate further. Officer Britton testified that the car appeared to be unoccupied but, upon approaching the car, he saw "the top of an individual's head, duck down into the vehicle." Officer Britton then drew his gun and told the individuals in the car to put their hands up. At that point, Officer Britton testified that he realized their car matched the description of the earlier broadcast and he called for backup. Officer Britton testified that the individual in the front seat kept dropping his hands and the individual in the back seat attempted to get out of the car. Officer Britton testified that he told them if they got out of the car he would shoot them. Officer Britton identified the Defendant at trial as the individual sitting in the back passenger seat who tried to open the door.

MPD Officer Michael Coburn testified that he took photographs and collected evidence found in the car after it was towed to the MPD crime scene warehouse. Officer Coburn identified multiple photographs, which were introduced at trial, including photographs of the car, two cell phones found in the car, a gun with an extended magazine found in the car, and a maroon ski mask found in the back seat of the car. Officer Coburn testified that the gun was loaded with a bullet in the chamber and that the magazine was loaded with live rounds.

Jerrica Norfleet testified that she was dating the co-defendant, Mario Patterson, in August 2013. Norfleet testified that she did not know the Defendant but that she had seen him "maybe, once or twice." On August 12, 2013, Norfleet picked up Patterson and drove him to his home around 10:00 or 11:00 p.m. When she arrived at Patterson's house, the Defendant was sitting outside on the porch. Norfleet testified that she later drove Patterson and the Defendant to a nearby corner store and that they were "just riding

around" while Patterson and the Defendant were "on their cell phones calling different people." Norfleet testified that they were calling people and asking "'do you know where some money is, or do you know where a lick is?'" Norfleet testified that, at the time, she did not know what a "lick" was, but now she knew it was a "robbery." Norfleet recalled that Patterson was directing her different places to go, and she "became frustrated and asked him to drive." After Norfleet got in the passenger seat and Patterson started driving, she saw Patterson pass a gun to the Defendant in the back seat. Norfleet testified that the Defendant then asked her to take a picture with her phone, and she "kind of reached back and took the picture." Norfleet stated that, "[o]nce I came up it was a picture of him wearing a ski mask and holding the gun." The photograph from Norfleet's phone was introduced at trial.

Norfleet testified that Patterson continued to drive and that they eventually approached "an older black couple downtown, headed towards Beale Street," and the Defendant stated something like "'Let's get them'" or "'Let's get them, they got some money.'" Because it was crowded downtown, Norfleet testified that they "couldn't get to that couple" so they made a left turn down another street "and that is when the victim was on the street." Norfleet testified that they saw the victim crossing the street and that "[y]ou could tell he probably was nervous, or something, or maybe scared, because he started to speed up to get across the street." Norfleet testified that Patterson was parking when the Defendant jumped out of the car. After Patterson parked the car he also got out, and the Defendant said something to the victim that Norfleet could not hear. Norfleet testified that the victim shouted, "'Get the fuck out of here'" and the Defendant responded, "'What do you mean get the fuck out of here?'" and then the gun went off. Norfleet jumped in the driver's seat from the passenger seat and started to drive. As she was driving away, Norfleet testified that she saw the victim falling and Patterson and the Defendant jumped in the back seat of the car. Norfleet also testified that, as she was driving, Patterson was directing her where to go and the Defendant "was shouting, 'That n**** said, get the fuck out of here, I should have got personal and shot that n**** three more times.'"

Norfleet testified that Patterson directed her to drive to the Foote Homes apartment complex. Norfleet backed into a spot in the apartment's parking lot and attempted to turn the car's headlights off but accidentally left the parking lights on because she was nervous. Norfleet testified that Patterson climbed in to the front passenger seat, and the Defendant remained in the back seat. Norfleet also testified that, because there were probably police in the area, they "would sit here for a second, [and] hopefully by that time everything will be okay and we could leave." However, Norfleet testified that a police officer drove past the apartments and then entered the parking lot and parked in front of her car. Norfleet stated that Patterson told everyone to "slouch down in the seat of the car," but the officer saw them and told them to put their hands up or he would

shoot. Norfleet testified that Patterson and the Defendant discussed running and opened their doors, but the officer told them if they ran he would shoot them. More officers arrived and arrested Norfleet, Patterson, and the Defendant. Norfleet made a statement to police and identified both Patterson and the Defendant in photographic lineups. Norfleet was also indicted in the instant case for accessory after the fact.

Dr. Erica Curry, a forensic pathologist and medical examiner, testified regarding the victim's autopsy report, which she performed on August 12, 2013. Dr. Curry described the victim's wound, which was illustrated by photograph. She stated that the gunshot entry wound was on the left side of the chest and that the exit wound was on the right side of the back. Dr. Curry testified that the bullet went through two ribs, the aorta, diaphragm, stomach, liver, and right kidney. The victim's toxicology report revealed the presence of alcohol and marijuana. Dr. Curry opined that, based on the autopsy performed, the victim's cause of death was the gunshot wound to the chest and the manner of death was homicide.

Sergeant Clarence Mabon of the Memphis Police Department testified that he was assigned to the homicide division when he interviewed the Defendant on August 12, 2013. Prior to the interview, Sergeant Mabon advised the Defendant of his Miranda rights and the Defendant was shown an advice of rights form. Sergeant Mabon said that the Defendant was cooperative and agreed to talk to Sergeant Mabon after waiving his rights. The Defendant provided a four-page typewritten statement, which read, in pertinent part, as follows:

[Question]: Are you aware that the Memphis Police Department is investigating a homicide that happened on August 12, 2013, at 275 South Main Street?

[Answer]: Yes.

[Question]: Are you the person responsible for this homicide?

[Answer]: Yes.

[Question]: Did you know the victim of this homicide?

[Answer]: No.

….

[Question]: Was anybody with you during this incident, and if so state their names?

[Answer]: Yes, Mario Patterson, Mario's girlfriend (I don't know her name).

....

[Question]: Did you have a weapon during this incident?

[Answer]: Yes.

[Question]: What kind of weapon did you have during this incident?

[Answer]: 9 Ruger Automatic . . . black.

[Question]: In your own words describe what happened before, during, and after this incident?

[Answer]: Last night I called Mario from Frayser to see if he was at the house, I was about to go spend the night at Mario's house. Then I got dropped off at Mario's house and that's when Mario and the girl pulled up at his house. I was sitting on the porch while Mario went into the house and grabbed a mask because he said he had to go and get some money. When Mario came back out of the house he gave me the mask and we got in the car and I laid the mask down on the side of the baby car seat. Then Mario's girlfriend took us to the store; I got a black and then we were just riding. Then we were riding and bust a left on Main Street and then me and Mario saw dude walking and I put on the mask and Mario passed me the gun. We hopped out the car; I [sic] the mask on but Mario didn't and Mario's girlfriend was still in the driver seat of the car. I up [sic] the gun and then Mario told the dude, "You know what it is" and then the dude got loud and said, "Get the fuck up out of here." Then I was finna [sic] run and get back in the car but the gun was already pointed at the dude while I was running back in the car and it went off. Then we told Mario's girlfriend to go to Foote Homes, we pulled up to Foote Homes and shortly after that the police pulled up in front of us. The police walked up to our car and

pulled a gun on us and told us to put our hands up and put us in the car and transported us down to 201 Poplar.

[Question]: Was this incident planned?

[Answer]: No it wasn't planned it was just random.

….

[Question]: Whose idea was it to stop the victim?

[Answer]: It was Mario's idea to stop the dude and to see what he had, we were gonna rob him.

. . . .

[Question]: What did you and Mario take from the victim?

[Answer]: Nothing.

[Question]: Why did you shoot the victim?

[Answer]: Because I was scared and dude was getting loud like he was gonna do something to Mario and me.

[Question]: Was the victim armed?

[Answer]: I don't know I didn't have time to see a gun because I was running back to the car.

The Defendant's initials were signed at the bottom of each page, and he signed the last page of the statement, which was read to the jury and admitted at trial.

Special Agent Eric Warren, an expert in firearms identification and comparison employed by the Tennessee Bureau of Investigation, analyzed the gun found in the car and the cartridge and bullet found at the scene. He testified that the gun, a Ruger semi-automatic pistol, was functioning properly. Agent Warren was also able to determine that the bullet obtained from the scene had been fired from the gun used by the Defendant. Agent Warren testified that there was no way the gun could discharge a bullet other than by pulling the trigger due to multiple safeties on the gun. On cross-examination, Agent Warren acknowledged that this particular gun had two trigger

settings, a single action and a double action. Agent Warren explained that, in single action mode, the trigger requires about five pounds of pressure to be pulled, "which would be similar to taking a five pound bag of sugar, or a gallon of milk and taking just your trigger finger and moving that by whatever distance this particular trigger travels, you know, a fraction of an inch, or an inch." In double action mode, Agent Warren explained that the trigger would require double the force, or "about ten pounds worth of pressure," to pull the trigger. Agent Warren acknowledged that there would be no way of knowing which setting the gun was on before it was fired in this case.

At the conclusion of the State's proof, the defense rested. After deliberation, the jury convicted the Defendant of first degree felony murder. The trial court approved the verdict and sentenced the Defendant to life imprisonment. The Defendant filed a timely motion for new trial on October 15, 2015, and a hearing was held on November 13, 2015. The court denied the motion and subsequently entered a written order. This timely appeal followed.

## ANALYSIS

The Defendant challenges the sufficiency of the evidence supporting his conviction for felony murder. The Defendant does not contest that he shot and killed the victim or that he attempted to rob the victim. Rather, the Defendant argues that he was wrongfully convicted of felony murder because he had abandoned his attempt to rob the victim when the shooting occurred. The State responds that the evidence was sufficient to support a conviction of felony murder.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of

review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Circumstantial evidence alone may be sufficient to sustain a conviction. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011). The jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

In order to sustain a conviction of first degree felony murder as charged in this case, the State was required to prove "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery . . . ." T.C.A. § 39-13-202(a)(2). "No culpable mental state is required . . . except the intent to commit the enumerated offenses or acts . . . ." Id. § 39-13-202(b). Robbery is an "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103. Criminal attempt requires, as relevant here, proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense . . . and the conduct constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3).

Because the Defendant claims that he abandoned his intent to rob the victim prior to shooting and killing him, we must determine whether the proof supporting his felony murder conviction satisfies the felony murder rule. In doing so, we recognize that the felony murder rule applies when the killing is "done in pursuance of the unlawful act, and not collateral to it." Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956). "The killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." Id. (quoting Wharton on Homicide, § 126 (3d ed.)). The killing "may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999).

If the underlying felony and killing were part of a continuous transaction with no break in the chain of events and the felon had not reached a place of temporary safety

between the events, felony murder is sufficiently established. State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000). This court has previously considered the following factors when determining the relationship between the underlying crime and the homicide: whether the victim was a witness to the theft-related crime; whether the victim was in close proximity to the crime; and whether the victim was killed because he might have tried to thwart the theft, expose the theft, or interfere in any way with the commission of the theft. State v. Terry, 813 S.W.2d 420, 424 (Tenn. 1991). If these factors, considered in light of the circumstances of the particular incident, reveal a definite break in the chain of events, eliminating the possibility of one continuous transaction from the initial attempt of the underlying felony to the homicide, then the felony murder rule cannot be applied. Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. Buggs, 995 S.W.2d at 107. "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108 (citing State v. Addison, 973 S.W.2d 260, 266 (Tenn. Crim. App. 1997); State v. Johnson, 661 S.W.2d 854, 861 (Tenn. 1983); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

The Defendant claims that he abandoned his intent to commit the underlying felony of attempted robbery prior to shooting and killing the victim; therefore, his felony murder conviction cannot stand. We respectfully disagree. Our review of the evidence presented at trial shows that the Defendant, along with his co-defendant, decided to commit a robbery on the night of the offense. While driving around and looking for a victim, they saw the victim walking alone on South Main Street and decided to rob him. When confronted, the victim yelled at the Defendant, and, in response, the Defendant claimed he became scared and attempted to retreat from the robbery. While doing so, the Defendant claimed the gun unintentionally discharged. However, a firearms expert testified that the gun was properly functioning with multiple safety features, and that, in order for the gun to discharge, at least five pounds of pressure must be applied to the trigger. The Defendant was shot once in the chest and later died from the gunshot wound.

Based on the above proof, we conclude that the underlying felony of attempted robbery and the killing were part of a continuous transaction with no break in the chain of events. The proof sufficiently established that the killing was committed in pursuance of the attempted robbery and not collateral to it. This case illustrates a classic example of the application of the felony murder rule. See, e.g., State v. Michael Lambdin, No. E2014-00547-CCA-R3-CD, 2015 WL 1897461 (Tenn. Crim. App. Apr. 27, 2015) and State v. Demariceo Chalmers, No. W2011-01274-CCA-R3-CD, 2012 WL 3601626 (Tenn. Crim. App. Aug. 22, 2012) (both rejecting a defendant's claim that he abandoned intent to rob the victim prior to shooting and killing the victim); see Smith v. State, 354

S.W.2d 450, 452 (Tenn. 1961) (stating that "the person who kills another while engaged in committing a felony cannot escape conviction from murder in the first degree, by showing that his intent was not to kill, but to defend his own life or person, or to escape arrest, or to avoid pursuit or death."); see also People v. Mills, 624 N.E.2d 384, 389-90 (Ill. App. Ct. 1993) (noting that "[c]hief among the inherent dangers of armed robbery is the danger arising from resistance by the victim . . . [i]t would defeat the purposes of the felony-murder doctrine if such resistance-an inherent danger of the forcible felony-could be considered a sufficient intervening circumstance to terminate the underlying felony or attempted felony."). Based on the evidence, we conclude that a reasonable jury could have found beyond a reasonable doubt that there was a connection in time, place, and continuity of action between the shooting and the attempted robbery. Accordingly, there is sufficient evidence supporting the Defendant's conviction of felony murder.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE